UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | CRIMINAL NO. 3:19CR59 (KAD) |
| v. | : | |
| | : | |
| JOSESPH DIAZ | : | June 4, 2021 |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The Government respectfully submits this Sentencing Memorandum with regard to defendant Joseph Diaz (the "defendant" or "Diaz") who is scheduled to be sentenced on June 16, 2021, at 2:00 p.m.

I. **INTRODUCTION AND OFFENSE CONDUCT**

For about two years (2011-2013), Joseph Diaz was a Hartford Police Cadet where he worked alongside Hartford Police officers and witnessed firsthand Hartford's struggles with crime and urban decay. In his letter to the Court, Diaz mentions his employment as a Cadet, but does not discuss how his path changed so dramatically from an aspiring police officer to an armed drug dealer. In the PSR, Diaz described his arrest as a "big eye-opener" and its impact on him and his family. *See* PSR ¶ 58 ("I don't want to go through this again." "This took a big toll on my family."). In his letter to the Court, Diaz explained, "[s]ince I was arrested, I have thought a lot about the dangers of Fentanyl to the community, how it can affect people and their family members." *See* Exh. A to Def. Sen. Mem. He continued, "I am grateful that in my wrongdoing to society I did not cause anyone to be deadly harmed[.]" *Id*. But did it really take his arrest for Diaz to think about the dangers of trafficking dangerous drugs? He "lost two friends to drug activity and gun violence" and at one point he and his family moved "due to issues of gun violence

1

and drug activity." See PSR ¶ 46. Diaz's eyes were not opened to the dangers of drug trafficking by his arrest. He knew well the perils of his decision to engage in such conduct.

Diaz described himself as "a person who always gave to the community and cares about humanity[,]" but yet he possessed enough fentanyl to administer more than 8000 doses of the lethal drug. While Joseph may not *know* if the fentanyl he distributed killed someone, there is no doubt it contributed to the destruction of the many lives and families to whom he sold drugs. But he knew all this well before his arrest; his own personal experiences and that as a former police cadet provided him a ring-side seat to the overwhelming impact of illegal drugs in his City.

II.     **GUIDELINE CALCULATION**

The parties stipulated that the quantity of fentanyl involved as part of the defendant's offense conduct was approximately 199 grams. Based on a quantity of 199 grams of fentanyl, the parties agreed that the base offense level for the lesser included offense of Count Three was 26. See U.S.S.G. § 2D1.1(c)(7) and PSR ¶ 25. Three levels are subtracted for the defendant's acceptance of responsibility, for a total offense level of 23. *Id*., at ¶ 34. The parties calculated the defendant's criminal history category (CHC) as category I. See PSR ¶ 38. A total offense level of 23 with a CHC I results in a recommended sentencing range of 46 to 57 months' imprisonment. *Id.* ¶ 73. A consecutive 60-month term of imprisonment is mandated for Count Four, resulting in a recommended sentencing range of 106 to 117 months of imprisonment. *Id.*

III.    **OFFENSE CONDUCT**

On February 13, 2019, members of the FBI Task Force were conducting surveillance in an unrelated investigation when they observed Joseph Diaz conduct a drug transaction on Stedman Street in Hartford. Stedman Street was known for its open-air drug transactions. Investigators

observed a drug customer, driving a BMW, arrive, park, and get on his phone. Soon thereafter, Diaz arrived driving a Chevy Impala. An investigator recognized Diaz as a former Hartford Police Cadet. Diaz stopped alongside the BMW and investigators observed Diaz exchange what appeared to be drugs with the driver for money. After the exchange, the two vehicles departed.

When the BMW failed to signal as it turned onto Barker Street, investigators had a marked police unit stop the vehicle. The driver was asked to step out of the vehicle. When asked if he anything illegal in his possession, he admitted that he had "dope" in his sock. Officers subsequently recovered nine bags of suspected fentanyl/heroin from his sock. The driver was placed under arrest and advised of his *Miranda* rights. The driver stated that he just purchased heroin from "Jay" on Stedman Street and provided the officers with "Jay's" phone number. The driver agreed to contact "Jay" to order more heroin/fentanyl.

Meanwhile, investigators followed Diaz to 81 Faith Road, Newington, and saw him enter the front door using a key. Sometime later, Diaz left his residence, but investigators lost him.

Under the supervision of investigators, the BMW driver/customer called Diaz and ordered "two more." Diaz told the driver/customer to meet him on Airport Road. Meanwhile, investigators determined that Diaz had switched cars. Investigators instructed the driver/customer to call Diaz again, which he did, and Diaz told him to meet on Stedman Street. Soon thereafter, investigators observed a dark colored Honda Accord parked in the area of 27 Stedman Street. The driver/customer confirmed that Diaz also drives a dark colored Honda Accord with tinted windows. Once investigators confirmed that Diaz was the operator, the Honda was stopped on Adelaide Street. Diaz was ordered out of the vehicle and as he was, Diaz

stated that he had his gun on him.   A Ruger .380 caliber pistol was in his right coat pocket.   Diaz also had money and three phones on his person.

Diaz was asked if he possessed a valid pistol permit.   He responded, "yes" and that it was in the black bag on the front passenger seat.   Inside the bag was approximately 700 bags of suspected heroin/fentanyl and Diaz's pistol permit.   More currency was located inside the car, along with another phone, for a total of $1704.   The DEA lab later confirmed the presence of fentanyl in the seized drugs with an approximate weight of 14 grams.

Diaz was transported to the Hartford Police station where he was advised of his rights and where he signed a rights waiver form.   Investigators asked Diaz if he had any illegal items inside his Newington residence and he replied, "na nothing, just some money."   Investigators asked Diaz if he was willing to consent to search his residence, and he replied, "yea go ahead."   Diaz then signed a Hartford Police Department consent to search form.   Investigators left the interview room, leaving Diaz alone.   Moments later, an officer observed Diaz typing something on his watch.   The officer immediately opened the door and Diaz quickly placed both his hands inside the front pockets of his sweatshirt.   The officer removed the watch and discovered that it was an "Apple" type watch.

Meanwhile, investigators returned to the Newington residence and made contact with Diaz's girlfriend, Rayana Galarza, who had arrived driving the Chevy Impala.   As investigators were talking to Galarza outside the residence, assisting Newington Police officers observed Jose Diaz quickly exiting through the rear door of the residence carrying a black plastic bag.   Jose then began to run towards the parking lot area.   When officers approached Jose, he dropped the plastic bag and a blue Fila fanny back.   Officers opened the bags and discovered the following.

4

Inside the black plastic bag was approximately 3200 bags of suspected fentanyl. In the fanny pack was another approximately 1028 bags of fentanyl, and assorted paraphernalia and packaging material. There was also a bag of unpackaged fentanyl which weighed approximately 80 grams. The DEA lab confirmed the presence of fentanyl.

Thereafter, the residence was secured to make sure no other persons were inside. Galarza was allowed to enter her residence. She was advised of her rights and she acknowledged that she understood her rights and waived them. She then provided written consent to search the residence.

The search revealed the following. In a safe, inside the master bedroom, was approximately $2500, a small quantity of packaged fentanyl and approximately 21 grams of unpackaged fentanyl. On the closet floor was a gun case with magazines, a pistol grip, a gun lock and firearm transfer paperwork. There was also additional ammunition for .380 and .22 caliber firearms. In a dresser, in the same bedroom, was a Ruger .22 caliber pistol, with loaded magazine.

Jose Diaz consented to a search of his phone. On Jose's phone screen there were several unopened text messages, including one from Diaz. The text message read "Go now. Everything."

IV. **IMPOSITION OF A REASONABLE SENTENCE UNDER 18 U.S.C. § 3553(a)**

    A. <u>Legal Standard</u>

Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The statute then provides:

The court, in determining the particular sentence to be imposed, shall consider–

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

    B.    <u>Sentencing Factors in 18 U.S.C. § 3553(a)(2)</u>

        1.    *Seriousness of the Offense, Respect for the Law, and Providing Just Punishment.*

Diaz was selling large quantities of deadly drugs, and he did so while armed with a loaded firearm. Firearms are frequently "tools of the trade" for drug dealers and are "regularly found on narcotics traffickers." *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003). Moreover, "firearms are conventionally regarded as essential equipment of criminals engaged in violent crime

. . . guns are without doubt the most potent and efficient instrument for violent crime." *United States v. Dillard*, 214 F.3d 88, 93 (2d Cir. 2000).

Diaz was selling fentanyl, which as we all know is killing users at an unprecedented pace. While it may be easier to forget the sobering cost of the opioid crisis during the COVID-19 global pandemic, it should not be ignored. Despite the COVID-19 pandemic, opioid related overdose deaths continue to increase. In 2016, fentanyl contributed to 53% of Connecticut's overdose deaths. *See* https://portal.ct.gov/-/media/OCME/Statistics/Calendar-Years-2012-to-June-2020.pdf (last viewed on June 4, 2021). That year saw 917 overdose deaths. *Id.* In 2020, by contrast, 1374 people died from accidental overdoses, and fentanyl was involved in 84% of all overdose deaths. *Id*. The 1374 deaths are a 14.5% increase from 2019, an almost 50% increase from 2016, and a 284% increase from 2012. During that span, the presence of fentanyl in Connecticut overdose deaths has increased a staggering 817%. But for the COVID-19 pandemic, the opioid epidemic, fueled principally by fentanyl, would be Connecticut's No. 1 public health crisis.

Clearly, there is a strong need for the sentence to reflect just punishment based on the seriousness of the offense.

2. *Adequate Deterrence and Protection of the Public*

Diaz has no adult criminal convictions. The quantity of fentanyl, however, along with his possession of a firearm, underscores the need for the sentence to protect the public and deter him from resuming criminal conduct. What is also concerning is that the defendant's history and characteristics (as articulated in the PSR) does not provide a clear understanding of how someone with no criminal history who as a young adult was pursuing a career in law enforcement graduates to selling large quantities of deadly opioids.

More troubling is that Diaz committed such a serious crime while he was supported by strong family relationships, had a started a family of his own, and was readily employable. Diaz did not sell drugs because he needed the money. He did not sell drugs to support an addiction. He did not sell drugs because he grew up in an environment where his options were limited. In fact, he never explains why he sold drugs. In his interview with Probation, Diaz reported that he has "made positive changes in [his] life to ensure that [he doesn't] go back to my previous life." But what was happening in his "previous life" that would lead him to be an armed drug dealer? That Diaz would make a calculated decision to sell dangerous drugs when everything in his life was going well underscores the need for this sentence to deter him from choosing that path again.

Moreover, Diaz's dangerousness was compounded by including his girlfriend and father in his criminal activities. In his effort to prevent law enforcement from seizing the copious amounts of fentanyl in the house he shared with his children, he enlisted his girlfriend and father to remove and conceal the drugs. Accordingly, there is also a strong need to protect the community.

3. *Educational and Vocational Training, and Medical Care and Treatment*

Diaz has a long history of chronic marijuana use and more recently an ongoing use of Percocet. *See* PSR ¶¶ 54-55. For a short time, until October 2018, Diaz also used heroin. *Id.* ¶ 56. There is no indication that Diaz sought or received treatment for his drug use.

He is in good physical and mental health. *See* PSR ¶¶ 53, 58. Diaz graduated high school and reported a very positive educational experience while at Bulkeley High School. *Id.* ¶ 59 and Exh. A to Def. Sen. Mem. Diaz has an established work history, though he had an unexplained gap in employment from November 2018 until April 2019. *Id.* ¶¶ 63-65. He has been gainfully

8

employed since his arrest, which highlights his choice to sell drugs rather than earn a legitimate income. *Id*. ¶¶ 61-62.

V.      **SUMMARY AND CONCLUSION**

Diaz's decision to sell drugs was a calculated one. He was employable and supported by a strong family. He certainly had many other options to earn a living as evidenced by his post-arrest conduct. That he would travel down this path is troubling. It says that Joseph Diaz cared about himself first and all those families devasted by the deadly drugs he sold, he cared not at all. He also put his family at risk by using his residence to store his dangerous drugs. He purports to love his children, but he never stopped to care about the children of his drug customers. Diaz obviously understood the danger and risks of selling large quantities of fentanyl as he carried and a loaded firearm when he sold drugs. For all the reasons set forth herein, the government recommends a sentence of 96 months of imprisonment.

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

/s/ *Brian P. Leaming*
BRIAN P. LEAMING
ASSISTANT UNITED STATES ATTORNEY
450 Main Street, Room 328
Hartford CT 06103
(860) 947-1101
Federal Bar No. CT 16075

CERTIFICATE OF SERVICE

       This is to certify that on June 4, 2021, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                              */s/ Brian P. Leaming*
                              BRIAN P. LEAMING
                              ASSISTANT UNITED STATES ATTORNEY